## Case No. 1,089.

### BASCOM et al. v. LANE et al.

[Brunner, Col. Cas. 348;[1] 4 Am. Law J. (N. S.) 193; 9 West. Law J. 162; 8 Leg. Int. 162.]

Circuit Court, D. New York. Nov. 11, 1851.

RELIGIOUS SOCIETIES—DIVISION OF CHURCH—DISTRIBUTION OF COMMON PROPERTY

A church conference may consent to the division of the church into two bodies, and such separation being in pursuance of proper authority will carry with it a division of the common property. Commissioners appointed by one of the divisions have power to file a bill against the trustees of the common property for a division of the same.

[See Smith v. Swormstedt, Case No. 13,112.]

[In equity. Bill by Henry B. Bascom and others, commissioners appointed by the general conference of the Methodist Episcopal Church South, against George Lane and another, agents of the book concern of the Methodist Episcopal Church, for a settlement and division of property of the church. Decree for complainants.]

Reverdy Johnson, Daniel Lord, and Mr. Johnson, Jr., for complainants.

Rufus Choate, George Wood, and E. L. Fancher, for respondents.

NELSON, Circuit Justice. The complainants state in their bill, that before and on the

[1] [Reported by Albert Brunner, Esq., and here reprinted by permission.]

8th day of June, 1844, there existed in the United States of America a voluntary association, known as the Methodist Episcopal Church, not incorporated, but composed of seven bishops, four thousand eight hundred and twenty-eight preachers belonging to the traveling connection; and, in bishops, ministers, and membership, about one million one hundred and nine thousand nine hundred and sixty, then being in the United States and territories thereof, united and holden together in one organized body, by certain doctrines of faith and morals, and by certain rules of government and discipline. That the general government of this church was vested in one body, called the general conference, and in certain subordinate bodies called annual conferences, and in bishops, traveling ministers, and preachers; and that the constitution, organization, form of government, and rules of discipline, as well as the articles of religion and doctrines of the church, were of general notoriety; but, for the more particular information of the court, reference is made to a printed volume, entitled "The Doctrines and Discipline of the Methodist Episcopal Church"; and the complainants allege that differences and disagreements have sprung up between what was called the northern and southern members, in respect to the administration of the church government, concerning the ownership of slaves by the ministry of the church, of such a character, and attended with such consequences, as threatened fearfully to impair the usefulness of the church, as well as permanently to disturb its harmony; and that it became a question of grave and serious importance whether a separation ought not to take place by some geographical boundary, so that the church should thereafter constitute two separate and distinct Methodist Episcopal Churches; and thereupon the complainants allege that at a general conference of the church, holden according to usage and discipline, at New York, on the 8th day of June, 1844, the following resolutions were duly adopted by a majority of over three fourths of the entire body. As the principal question in the case arises upon these resolutions, we copy them entire.

Resolved, By the delegates of the annual conferences, in general conference assembled: —1. That should the annual conference in the slave-holding states find it necessary to unite in a distinct ecclesiastical connection, the following rule shall be observed with regard to the northern boundary of such connection: All the societies, stations, and conferences, adhering to the church in the south by a vote of the majority of the members of said societies, stations, and conferences, shall remain under the unmolested pastoral care of the southern church; and the ministers of the Methodist Episcopal Church shall in no wise attempt to organize churches or societies within the limits of the church south, nor shall they attempt to exercise any pastoral oversight therein, it being understood

that the ministry of the south reciprocally observe the same rule in relation to stations, societies, and conferences, adhering by a vote of a majority to the Methodist Episcopal Church; provided, also, that the rule shall apply only to societies, stations, and conferences bordering on the line of division, and not to interfere with charges which shall, in all cases, be left to the care of that church within whose territory they are situated. 2. That ministers, local and traveling, of every grade and office, in the Methodist Episcopal Church, may, as they prefer, remain in the church, or, without blame, attach themselves to the church south.

Resolved, By the delegates of all the annual conferences in general conference assembled, that we recommend to all the annual conferences, at their first approaching sessions, to authorize a change of the sixth restrictive article, so that the first clause shall read thus: "They shall not appropriate the produce of the book concern, nor of the charter fund, to any purpose other than for the benefit of the traveling, supernumerary, superannuated, and worn-out preachers, their. wives, widows, and children, and to such other purposes as may be determined upon by a vote of two thirds of the members of the general conference." 3. That whenever the annual conference, by a vote of three fourths of all their members voting on the third resolution. shall have concurred in the recommendation to alter the sixth restrictive article, the agents at New York and Cincinnati shall, and they are hereby authorized and directed to deliver over to any authorized agent or appointee of the church south, should one be organized, all notes and book accounts against the ministers, church members, or citizens, within its boundaries, with authority to collect the same for the sole use of the southern church; and that said agents also convey to aforesaid agent or appointee of the south, all the real estate, and assign to him all the property, including presses, stock, and all right and interest connected with the printing establishments at Charleston, Richmond, and Nashville, which now belong to the Methodist Episcopal Church. 4. That when the annual conferences shall have approved the aforesaid change in the sixth restrictive article, there shall be transferred to the above agent for the southern church so much of the capital and produce of the Methodist book concern as will, with the notes, book accounts, presses, etc., mentioned in the last resolution, bear the same proportion to the whole property of said concern that the traveling preachers in the southern church shall bear to all the traveling ministers of the Methodist Episcopal Church. The division to be made on the basis of the number of traveling preachers in the forthcoming minutes. 5. That the above transfer shall be in the form of annual payments of $25,000 per annum, and specifically in stock of the book concern, and in southern notes and accounts due the establishment, and accruing after the first transfer mentioned above; and until the payments are made, the southern church shall share in all the net profits of the book concern, in the proportion that the amount due them, or in arrears, bears to all the property of the concern. 6. That Nathan Bangs, George Peck, and James B. Finley be, and they are hereby appointed commissioners, to act in concert with the same number of commissioners, appointed by the southern organization (should one be formed), to estimate the amounts which will fall due to the south by the preceding rule, and to have full power to carry into effect the whole arrangement proposed with regard to the division of property, should the separation take place. And if by any means a vacancy occurs in this board of commissioners, the book committee at New York shall fill said vacancy. 7. That whenever agents of the southern church are clothed with legal authority or corporate power, to act in the premises, the agents at New York are hereby authorized and directed to act in concert with said southern agents so as to give the provisions of these resolutions a legally binding force. 8. That all the property of the Methodist Episcopal Church, in meeting-houses, parsonages, colleges, schools, conference funds, cemeteries, and of every kind, within the limits of the southern organization, shall be forever free from any claim set up on the part of the Methodist Episcopal Church, so far as this resolution can be of force in the premises. 9. That the church so formed in the south shall have a common right to use all the copyrights in possession of the book concern at New York and Cincinnati, at the time of the settlement by the commissioners. 10. That the book agents at New York be directed to make such compensation to the conferences south for their dividend from the chartered fund, as the commissioners above provided for shall agree upon. 11. That the bishops be respectfully requested to lay that part of this report requiring the action of the annual conferences before them as soon as possible, beginning with the New York conference.

The complainants further allege that the said general conference had full and competent power and authority to adopt the resolutions, each and all of them, and that the same became of binding force and validity; and that in pursuance of said resolutions, such proceedings were afterwards had in the several annual conferences of the Methodist Episcopal Church in the slaveholding states. in general convention assembled by delegates (elected on the basis of the resolutions of the general conference of 1844) at Louisville, Kentucky. On the 1st day of May, 1845, the following resolution was adopted after mature and deliberate consideration:—

Be it resolved, by the delegates of the several annual conferences of the Methodist Episcopal Church in the slave-holding states,

in general convention assembled, that it is right, expedient, and necessary to erect the annual conferences represented in this convention into a distinct ecclesiastical connection, separate from the jurisdiction of the general conference of the Methodist Episcopal Church, as at present constituted; and, accordingly, we, the delegates of said annual conference, acting under the provisional plan of separation adopted by the general conference of 1844, do solemnly declare the jurisdiction hitherto exercised over said annual conferences, by the general conference of the Methodist Episcopal Church, entirely dissolved; and that said annual conferences shall be, and they are hereby constituted a separate ecclesiastical connection under the provisional plan of separation aforesaid, and based upon the discipline of the Methodist Episcopal Church, comprehending the doctrines and entire moral, ecclesiastical, and economical rules and regulations of said discipline, except only in so far as verbal alterations may be necessary to a distinct organization, and to be known by the style and title of the Methodist Episcopal Church South. Yeas, ninety-four.

And that afterwards, on the 2d day of July, 1845, a council of the bishops of the Methodist Episcopal Church met at New York (which council was composed of the northern bishops), and then and there adopted unanimously the following resolutions:—

1. Resolved, That the plan reported by the select committee of nine at the last general conference, and adopted by that body, in regard to a distinct ecclesiastical connection, should such a course be found necessary by the annual conference in the slave-holding states, is regarded by us of binding obligation in the premises as far as our administration is concerned.

2. Resolved, That in order to ascertain fairly the desire and purpose of those societies bordering on the line of division, in regard to their adherence to the church, north or south, due notice should be given of the time, place, and object of the meeting for the above purpose, at which a chairman and secretary should be appointed, and the sense of all the members present be ascertained, and the same be forwarded to the bishop who may preside at the ensuing annual conference; or forward to said presiding bishop a written request to be recognized and have a preacher sent them, with the names of the majority appended thereon.

And the complainants allege and insist, that by and in virtue of the foregoing proceedings, the Methodist Episcopal Church in the United States, as it had existed before the year 1844, became and was divided into two distinct Methodist Episcopal Churches, with distinct and independent organizations, powers, and authority, compounded of the several annual conferences, charges, stations, and societies, lying or being situated north and south of the aforesaid line of division.

And the complainants further allege, that, by force of the foregoing proceedings, the Methodist Episcopal Church South became and was entitled to its proportion of all the property, real and personal, and of all funds and effects which, up to the time of the separation, had belonged to the Methodist Episcopal Church; and that the church south was and is so entitled, without any change or alteration of the sixth restrictive article above mentioned. That before and on the said 8th day of June, 1844, the Methodist Episcopal Church owned and possessed a large amount of property in various parts of the United States, real and personal, which was in the hands of agents and trustees; and, among others, large interests therein belonged to the said church, in what was denominated the book concern, in the city of New York, consisting of houses and lots, machinery, printing presses, book bindery, books, papers, debts, cash, etc., amounting to about the sum of seventy-five thousand dollars, the whole of which property is now in the possession of the defendants, Lane and Scott, as book agents.

And the complainants further allege, that after the division of the Methodist Episcopal Church into two distinct churches, by virtue of the resolutions of the general conference of 1844, and the action of the annual conference of the south, as hereinbefore set forth, the agents of the book concern, since the year 1845, have utterly refused to pay the annual conferences south, or to the complainants for and in behalf of them, their said just proportion of the profits and income to the said book concern, and still continue to withhold the same. That the said general conference of the church south, holden at Petersburg, Virginia, in May, 1845, in pursuance of and in compliance with the plan of separation of 1844, proceeded to appoint the complainants, Bascom and Green, together with S. A. Latta, commissioners, to meet the commissioners appointed by the general conference of the Methodist Episcopal Church of 1844, and to settle and receive from said commissioners the just proportion of the property and effects due to the church south, according to the said plan of separation; and that the said Bascom, Green, and Latta afterward applied to Nathan Bangs, George Peck, and James B. Finley, appointed by the general conference, in 1844, as the said book agents, to meet them for the purpose of a settlement and division of the said property, and have repeatedly called on them for that purpose; but that the defendants have wholly failed and refused to act in the premises; nor have they been enabled to induce the said book agents, nor commissioners, nor church itself, to pay to the said church south its proportionate share of the said property and funds, as provided in the said plan of separation.

And the complainants allege that they are members of the Methodist Episcopal Church

South; that Kelly and Allen are supernumerary preachers, and Tevis a superannuated preacher; and that they belong to the traveling connection of the said church; and as such have a personal interest in the estate, real and personal, now holden by the Methodist Episcopal Church, by the defendants, as agents and trustees appointed by the general conference; that there are about fifteen hundred preachers belonging to the traveling connection of the Methodist Episcopal Church South, each of whom has the same personal interest in the said property as the complainants; and that the great number of persons thus interested in the recovery sought by the said bill makes it inconvenient, if not impossible, to bring them before the court as complainants; that they are citizens of states other than the state of New York, and that their interests exceed the sum of two thousand dollars; that the defendants, Lane and Scott, have the custody and control by law, and by virtue of their appointment as agents of the book concern, of all the property and effects of the said concern, as above described.

The complainants further allege, that the entire membership of the Methodist Episcopal Church South is about four hundred and sixty thousand five hundred and fifty-three; and that the entire membership of the church north is about six hundred and thirty-nine thousand and sixty-six; and that it is therefore impossible to bring all the parties in interest before the court in this bill, either as complainants or defendants.

The defendants admit the adoption of the resolutions of the general conferences of the 8th of June, 1844, by a majority of over three fourths of the entire body; but allege that the said resolutions were, in respect to their operation and effect, provisional and contingent, and were intended to meet a future emergency, that it was supposed might arise in the church between the northern and southern members; and further, that the said resolutions, called the plan of separation, were not duly or legally passed; and that the general conference had no power or authority to pass or adopt the same, except that portion comprising the recommendation to the annual conferences to change the sixth restrictive rule; and that the last named resolutions, when adopted, were null and void, and without any binding force, except as a matter of recommendation. The defendants further insist, that even had the so-called plan of separation been constitutional and valid, it merely provided for a prospective plan, which without the happening of certain future conditions, or on the failure of which conditions, or either of them, could not, by its express terms, nor was it ever intended to have any force or validity, and is null and void. And that the same was never ratified by the annual conferences named therein; and that the southern annual conferences have, in all respects, as to the

church south, acted on their own responsibility, without any authority from the general conference of 1844. The defendants admit that the resolutions set forth in the complainants' bill were adopted by the convention of delegates from the annual conference in the slave-holding states, assembled at Louisville, Kentucky, on the 1st of May, 1845; but they deny that the delegates comprising said convention were selected on the basis, or according to the authority of the provisional plan of separation of 1844. And they insist that the Methodist Episcopal Church South exists as a separate ecclesiastical connection, by the actions and doings of the individual bishops, ministers, and members attached to such church, proceeding in the premises on their own responsibility; and that such bishops, ministers, and members have voluntarily withdrawn themselves from the Methodist Episcopal Church, and have renounced all their rights and privileges in the communion and under her government. The defendants further admit that the council of bishops of the Methodist Episcopal Church, called the northern bishops in complainants' bill, met and adopted the resolutions therein stated. They deny that this church, as it existed before the year 1844, or as it at any time existed, was lawfully divided into two distinct Methodist Episcopal Churches, as alleged in the said bill; but that the separation and withdrawal from the church of a portion of the bishops, ministers, and members was an unauthorized separation. The defendants admit that before and on the 8th day of June, 1844, the Methodist Episcopal Church owned and possessed large amounts of property in various parts of the United States, and that the property, consisting of the book concern, with all houses, lots, machinery, printing presses, etc., is now, and always has been, the property of the preachers belonging to the traveling connection of the Methodist Episcopal Church and their families; but that, if such preachers do not, during life, continue in such traveling connection, and in communion, and subject to the government of the said church, they forfeit, for themselves and their families, all their ownership in, and all claim upon, said book concern, and the produce thereof. They admit that all lands, property, and effects pertaining to the said book concern are in the possession of the defendants, Lane and Scott, as agents duly appointed by the general conference. They admit, also, that the said book concern was originally commenced by traveling members of the Methodist Episcopal Church, on their own capital, with the design, in the first place, of circulating religious knowledge, and by whom it was surrendered to the ownership of all the traveling preachers in full connection, and made subject to the control of the traveling preachers in their general conference; and that it was agreed, from time to time, the profits arising from the sale of the books should

be applied to pious and charitable objects, but principally to the support of traveling ministers and their families, until, in the general conference of 1796, it was determined that the said moneys should in future be applied wholly to the relief of traveling preachers, including such of them as were deceased; and that it was resolved in that conference that the produce of the sale of the books, after the book debts were paid, and a sufficient capital provided for carrying on the business, should be regularly paid "for the relief of distressed traveling preachers, for the families of traveling preachers, and for the superannuated and worn-out preachers, and the widows and orphans of preachers."

We have thus stated what we regard as the material parts of the bill and answer. A good deal of documentary proof was read on the hearing; but upon the view we have taken of the case, it will not be necessary to refer particularly to it, except as stated in the course of this opinion, as most if not all of the facts material to be noticed are matters of serious dispute. Indeed, the bill and answer present most of the facts upon which our opinion will be founded. The complainants include traveling, supernumerary, and superannuated preachers belonging to the traveling connection of preachers in the Methodist Episcopal Church South, representing in this suit a numerous body in that connection, and claim their proportionate share in the profits of the book concern, which this description of persons were confessedly entitled to before the division of the Methodist Episcopal Church into two distinct organizations took place, under the plan of separation of 1844. This book concern was established at a very early day, by the traveling preachers in connection with that church, and the profits to be derived therefrom, devoted by them to the relief of their distressed supernumerary and worn-out brethren, their widows and orphans. The establishment was small at first, but at present is one of a very large capital, and of extensive operations, producing great profits, to be applied in behalf of the objects of charity. It has, doubtless, been conducted with great judgment, and prudence by the agents in the immediate charge of it; but its growth and present magnitude are not less owing to the labor and devotion of the body of the traveling preachers, who have always taken the principal charge of the circulation and sale of the books in the Methodist connection throughout the United States, accounting to the proper authorities for the proceeds.

The traveling preachers of this church were the founders of this charity, and have designated the objects and purposes to which it shall be applied; and if it is, at any time, wrongfully withheld by those in the immediate charge of it, or diverted from the objects designed by the founders, it is the duty of the court to interfere and enforce the execution of the trust. The foundation of this charity is peculiar and novel, differing essentially from the cases of this description that have heretofore fallen under the equitable jurisdiction of a court of chancery. The traveling preachers are both the founders and the beneficiaries. They are the proprietors of the charitable fund, and, according to the constitution under which the endowment was made, also entitled to its proceeds.

We do not perceive, however, that these considerations can in any way affect the nature or character of the interest of the complainants, or confer upon them a title to the enjoyment of their proportion of the proceeds, superior to that of beneficiaries of a pure charity, where a third person has made the endowment in the ordinary way for charitable and pious uses, or, that it can be administered upon any other principles than those governing courts of equity in this class of cases. For, according to the original constitution of this fund by the founders, who had a right to prescribe the terms and conditions upon which the proceeds or profits should be distributed, and the persons to whom and which when prescribed furnishes the law of the case for the court, these proceeds and profits have been devoted to the relief of distressed, traveling, supernumerary, and worn-out preachers in the connection of the Methodist Episcopal Church, their widows and orphans; and to entitle the complainants, and those they represent, to the enjoyment they must bring themselves within the description. We must add, however, that the connection of this body with the original establishment, and subsequent growth of this fund, as a portion of its founders give to their claims a peculiar merit, which cannot but impress upon the court an anxiety so to administer it as to secure to them the benefit of the fruits of so sacred a trust, if reasonably consistent with the rules and principles of equity, and intent of the original founders.

The bill brings the complainants clearly within the description of persons entitled to a distribution of the proceeds of the fund; and the main question in the case, therefore, arises upon the answer and proofs in support of it. It is insisted,—1. That the resolutions of the general conference of 1844, when properly understood, do not impart an unqualified assent of that body to a division of the Methodist Episcopal Church into two separate and distinct organizations or churches; that the assent thereby given was conditional and contingent, and that the conditions were not complied with, nor has the contingency happened. 2. That, if otherwise, the general conference was not possessed of competent power and authority to assent to or authorize the division. And, 3. That the division, therefore, that took place was a nullity; and the separate organization a wrongful withdrawal and disconnection from the membership, communion, and government of the church, by reason of which

the traveling, supernumerary, and worn-out preachers composing the separate organization, are taken out of the description of the beneficiaries of the fund. There were some other matters brought into view in the course of the argument which we may notice hereafter; but the above petitions present the main grounds upon which the defense rests.

1. As to the resolutions, or the plan of separation, as they are usually called. The first one declares, that should the annual conference of the slave-holding states find it necessary to unite in a distinct ecclesiastical connection, the following shall be observed with regard to the northern boundary of such connection: All the societies, stations, and conferences adhering to the church in the south by a vote of the majority of the members shall remain under the unmolested pastoral care of the southern church; and then follows a mutual stipulation that each church shall abstain from organizing churches or societies within the boundaries of the other; and also from exercising any pastoral oversight therein. The second, that ministers, local and traveling, of every grade and office, in the Methodist Episcopal Church, may, as they prefer, remain in that church, or without blame attach themselves to the church south. The fifth resolution declares that all the property of the Methodist Episcopal Church, in meeting-houses, colleges, schools, conference funds, cemeteries, and every kind, within the limits of the southern organization, shall be free from any claim set up on the part of the Methodist Episcopal Church, as far as this resolution can be of force in the premises. The third is a recommendation to the annual conferences at their approaching sessions, to authorize a change of the restrictive article of the fundamental law of the church, which we shall have occasion to examine with some particularity in another branch of this case, and which prohibited the general conference from appropriating the produce of the book concern to any other purpose than for the benefit of the traveling, supernumerary, and worn-out preachers, their widows and orphans, without the concurrence of the annual conferences.

The change recommended was to add to the clause of limitation, "and to such other purposes as may be determined upon by a vote of two thirds of the members of the general conference." The object of recommending this change was to enable the general conference to proceed at once, and make an equitable division of the property and effects belonging to the Methodist Episcopal Church, as then organized between the two separate organizations. For this purpose, the next resolution provided that as soon as the annual conferences shall have concurred in the recommendation, the agents at New York and Cincinnati were directed to deliver over to the agent of the church south all notes, etc., against the ministers, members, or citi-

zens within its boundaries, for the sole use of said church; and also to convey to such agent all the real estate and other property connected with the printing establishments at Charleston, Richmond, and Nashville, which then belonged to the church; and in the one following, that there should be transferred to the said agent so much of the capital and produce of the Methodist book concern as would, with the property and effects before mentioned, bear the same proportion to the whole property of the said concern that the traveling preachers in the southern church bore to all the traveling preachers of the Methodist Episcopal Church. The terms and mode of payment were then prescribed, and commissioners appointed to meet commissioners to be appointed by the southern organization to estimate and fix the amount that might fall due them according to the preceding arrangement. And in winding up, the bishops are requested to lay that part of the report (resolutions) requiring the action of the annual conferences before them as soon as possible.

Now it will be seen from this analysis of the plan of separation, that the only condition or contingency upon which an absolute division of the church organization was made to depend was the action of the several annual conferences in the slave-holding states. If these should find it necessary to unite in favor of a distinct organization, by the very terms of the plan, the separation was to take place according to the boundary designated. It was left to them to judge of the necessity; and their judgment is made final in the matter. And when the decision is made, and the church is divided into two separate bodies, it is declared ministers of every grade and office in the Methodist Episcopal Church may, as they prefer, remain in that church, or, without blame, attach themselves to the church south. The whole plan of separation confirms this view. As soon as the separation takes place in accordance with the first resolution, all the property, in meeting-houses, parsonages, colleges, schools, conference funds, and cemeteries, within the limits of the southern organization, is declared to be free from any claim on the part of the northern church. The general and common property, such as notes and other obligations, together with the property and effects belonging to the printing establishments at Charleston, Richmond, and Nashville, and the capital and produce of the book concern at New York, was referred for future adjustment. This was necessary, on account of the restrictive article upon the power of the general conference, in respect to the produce of the book concern and charter fund. Some delay was necessary to procure that authority from the annual conferences. But one mode of the adjustment was settled, depending only upon the action of the conferences in respect to the authority. The notes and book debts against persons within the south-

ern church, together with the several printing establishments situated within its limits, were to be transferred to that church; and also so much of the capital and produce of the book concern, which, together with the aforesaid property, would bear the same proportion to the whole interest in that concern as the traveling preachers in the southern church bear to all the traveling preachers of the Methodist Episcopal Church. This perfected the adjustment of the common property between the two organizations.

It will be seen looking back to the plan of separation, that the only contingencies or conditions subsequent to be found in it are two. First, the separate organization was to depend upon the action of the annual conferences in the slave-holding states; and, second, the division of this latter portion of the common property of the church, upon the action of all the annual conferences in respect to the change of the restrictive article. When the annual conferences in the slave-holding states acted and organized a southern church, as they did, the division of the Methodist Episcopal Church into two organizations became complete. And so would the adjustment of the common property between them, if the assent of all the annual conferences had been given to the change of the restrictive article. The failure to give that has left this part of the plan open, the only consequence of which is to deprive the southern division of its share of the property dependent upon this assent, and leave it to get along as it best may, unless a right to recover its portion legally results from the authorized division into two separate organizations.

The argument against this view is, that the separation was to take place, not only in the event of the concurrence of the southern conferences, but also upon the assent of all the annual conferences to change the restrictive article. And the preamble to the plan of separation was referred to as countenancing this construction. We think otherwise. On the contrary, in our judgment, it confirms the view above taken. That preamble recites that a declaration had been presented to the general conference with the signatures of fifty-one delegates of that body from thirteen annual conferences in the slave-holding states representing that for various reasons enumerated, the objects and purposes of the Christian ministers and church organization cannot be successfully accomplished by them, under the jurisdiction of the general conference, as then constituted; and that in the event of a separation, a contingency to which the declaration asks attention, as not improbable, we esteem it the duty of the general conference to meet the emergency with Christian kindness and the strictest equity. Then follows the plan of separation, and it leaves the strongest impress throughout of the conviction and spirit so feelingly and impressively announced in the preamble. The question of separation is left to the judgment of their southern brethren in the church, where delegates had declared the necessity, and provision is made for the adjustment and division of the common property which, so far as we know, are founded upon principles of "the strictest equity," between the parties, and then the constitutional powers of the conference are exhausted in the endeavor to carry out this division. It is apparent, from the plan of separation, as well as from the whole course of the proceedings, that if this body had possessed the power, or had believed that they possessed it, to make an effectual division of the property, it would have been made at the time, dependent only upon the determination of the southern conference for a separate organization. They advanced as far as was supposed to be in their power, and took immediate steps to obtain the necessary authority to perfect it. The division of the property was not an element that entered into the consideration of the southern delegates to declare for a separate organization. They related to a different subject, and one of much more transcendent interest to the churches, north and south, and which during the present session had threatened to rend the vast and heretofore compact body of Christians in pieces. The agitation growing out of it had reached the highest authorities of the church, and had brought in conflict its chief functionaries and ablest members, and in respect to which opinions were entertained and expressed, deep and irreconcilable. In the judgment of a large portion of the body, separation was the only alternative to peace, the future Christian fellowship and usefulness of the church. The division of the property was but a consequence of separation, subordinate, and of comparative insignificance. Instead of the division of the church depending upon the division of the common property, the very reverse is the result of the true construction of the plan of separation.

2. As to the power of the general conference to authorize a separation of the church organization. The Methodist Episcopal Church of the United States was established in its government, doctrine, and discipline, by a general conference of the traveling preachers in the communion in 1784. Down to that time the Methodist Societies in America had been governed by John Wesley, the founder of this denomination of Christians, through the agency of his assistants. During this year the entire government was taken into the hands of the traveling preachers with his approbation and assent. They organized it, established its doctrines and discipline, appointed the several authorities, superintendents or bishops, ministers and preachers to administer its polity, and promulgate its doctrines and teaching throughout the land. From that time to this, the source and fountain of all its temporal

power are the traveling preachers in this connection in general conference assembled. The lay members of the church have no part or connection with its governmental organization, and never had. The traveling preachers comprise the embodiment of its power, ecclesiastical and temporal, and, when assembled in general conference, according to the usages and discipline of the church, represent themselves, and have no constituents; and thus the organization continued until the year 1808, when a modification took place. At the general conference of that year, composed of all the traveling preachers, it was resolved to have thereafter a delegated conference, to be composed of one of every five members of each annual conference. These annual conferences are composed exclusively of traveling preachers. The ratio of representation has been altered from time to time, so that in 1844 the annual conferences were represented by one delegate for every twenty-one members.

The reason for the change to a delegated body, instead of the assemblage of the entire body of traveling preachers, was the great enlargement of the boundaries of the church, which had expanded with the settlement of the country, the consequent multiplication of the traveling preachers, the distance and expense of travel, and the deprivation of the field of their labors for too long a period of the Christian ordinances, and religious instruction. The general conference of 1808, which determined in favor of a delegated body for the future, imposed upon the powers of this body certain limitations, which, in the language of the proceedings of the church, are called restrictive articles, six in number. It is declared that the general conference shall have full powers to make rules and regulations for the church, under the following limitations and restrictions:—1. They shall not alter or change the articles of religion, nor establish any new standards of doctrine. 2. They shall not allow of more than one representative for every fourteen members of the annual conference, nor less than one for every thirty. 3. They shall not alter the government so as to do away with Episcopacies, or destroy the plan of itinerant superintendencies. 4. They shall not change the general rules of the united societies. 5. They shall not deprive the ministers or preachers of trial by committee, and of appeal, nor the members, of trial before the society or lay committee and appeal. 6. They shall not appropriate the produce of the book concern, nor the charter fund, to any purpose other than for the benefit of the traveling, supernumerary, superannuated, and worn-out preachers, their wives, widows, and children; provided, that upon the concurrent recommendation of three fourths of all the members of the annual conferences present and voting, a majority of two thirds of the general conferences succeeding, shall suffice to alter any of the above restrictions, except the first article. These comprise all the limitations upon that body assembled by delegates. That the general conference composed of all the traveling preachers, and who established the government, doctrines, and discipline of the church, possessed the power to reconstruct and reorganize the government, ecclesiastical and temporal, into two or more separate and distinct organizations, is a question about which we think no serious doubt can well be entertained. These traveling preachers represented the sovereign power of the government, and were responsible to no earthly tribunal for the mode and manner of its exercise. They were entirely free to exercise their own sense and judgment as to what was the best polity and organization of the church, to accomplish this great object and design of the master in whose service they were engaged, and which were, in the language of their own discipline, "to reform the continent, and to spread scriptural holiness over these lands." As they might have constructed any number of separate and distinct organizations in their first fraternal association and effort in the fulfillment of their mission, according, as it might seem to them best, so was it equally in their power at any subsequent period of their labors. The power remained unchanged.

The only argument urged against this view is the unity of the first organization of the church in 1784, which, as supposed, evinced a design that it should be co-extensive with the territorial limits of the United States, neither more nor less; and to remain and continue a united church within these limits in the exercise of its jurisdiction, spiritual and temporal; and further, that, if a power exists in any general conference to break up this organization and polity of the church, as originally designed and established, it belongs to an extraordinary general conference assembled especially for the purpose, and not to one assembled in the ordinary way, for the discharge of its mere administrative duties, as the chief legislative body of the church; and the history, ecclesiastical judicatories, practice, and usages of the church from its origin were ably and extensively received and examined, on the argument, for the purpose of sustaining these several positions. But the obvious answer to them is that the argument overlooks the source and fountain of the power belonging to the general conference. We must look to these, and not to the mere exercise of power in the administration of the sacrament, when seeking to measure its depth and extent. Where is the limit? And who has prescribed it? The traveling preachers assembled in general conference embody, in themselves, the sovereign power; and we have nowhere seen their consent to any limitation or restriction till all come down, in the history of their administration, to the conference of 1808. We must have some evidence that they have parted with a portion of their sovereign

power that confessedly belonged to them at the first organization since that period; and that they assembled in the subsequent conferences, subject to the disability, before their power can be distinguished from those originally possessed. We have not been referred to any such evidence, nor have our own researches discovered any, nor do we believe there are any recorded acts or declarations of this body to the effect claimed. As jurisdiction and authority, spiritual and temporal, in each general conference, from 1784 to 1808 inclusive, were the same, unlimited and unrestrained, possessing all the power, which since the latter period has belonged to the general and annual conferences combined under the new organization, it necessarily follows that all the power and authority possessed by the annual conferences have been conferred upon them from time to time by the general conference.

The arguments that this body, previous to 1808, did not possess the competency to reorganize and reconstruct the government and the church, as they might think best for the great objects of its mission, goes the length of denying that power to the concurrent action of both the general and annual conferences since that period. And that there is something in this association and system of policy, differing so radically from all others of which we have any knowledge, that even the constituent and representative, although comprising every element of power appertaining to the government, can neither change or modify it. As the argument comes down to this, we cannot think it necessary to pursue this branch of the case any longer. As it respects the powers of the general conference since the modifications of 1808, it is the same as previously existed, subject to the six restrictive articles; and neither of them has any connection with or bearing upon the question we have been considering. They relate to the doctrine of one church, its representative in the general conference, the Episcopacy, discussion of preachers and members, the book concern and charter fund. These concern the exercise of the administrative powers of the conference, and are intended as limitations upon them, no less concurred in by the annual conferences. The powers conferred upon the general conference are broad and unlimited, subject only to those checks in regulating the doctrine, and perhaps discipline, of the church. In all other respects, and in everything else that concerns it, this body shall represent the sovereign power the same as before. The practice of the general conference since the change in 1828 confirms this view. The connection of the annual Upper Canada conference with the Methodist Episcopal Church was dissolved in 1828, and that body authorized to erect itself into an independent ecclesiastical establishment. The force of this precedent has been attempted to be weakened upon the allegation, that this connec-

tion differed from that of the annual conferences within the United States; and that it rested upon a sort of compact between that conference and this church, and therefore held a different relation to it. But on looking into the history and discipline of the church, this will be found to be a misapprehension of that resolution; and that the Canada conference was brought within its folds in the same way as those lying upon the frontier settlements within the United States. It will be found that as early as 1804, the Upper Canada districts were included in the New York annual conference, and continued as a part of it, the same as other districts, till 1812, when these districts, and also the Lower Canada districts, were included within the Genesee conference. In 1816, the Lower Canada districts were embraced within the New York and New England conferences. In 1820, both Upper and Lower Canada were again included in the Genesee conference; and in the same year, the bishops were authorized, with the concurrence of this conference, to establish an annual conference in Canada; and in 1824, the Canada conference included the whole of the Upper Province, and thus it stood in 1828, when erected into an independent establishment.

We have seen nothing in the history, discipline, or practice of the church restricting its organization or Christian labors to the territorial limits of the United States; but much to show that both have been steadily devoted to the accomplishment of the high and holy mission avowed in founding the church, namely, "to reform the continent, and to spread scriptural holiness over these lands." As early as 1840, the republic of Texas was incorporated into its bosom, and an annual conference established. And we doubt not but that, as the principles of civil liberty and religious toleration work their way in the advancement of civilization over regions hitherto impenetrable to the missionary, unless of a particular faith, this great work of organization and Christian labor will be carried on regardless of territorial boundaries or forms of secular government. In referring to the practice of the church, we must not overlook the action of the general conference of 1844, in the instance now before us. The vote upon the first resolution stood one hundred and forty-seven to twenty-two, in a body representing more than four thousand traveling preachers in this communion; and among whom, it is fair to suppose, were included men of the greatest experience and knowledge in the administration of the polity of the church. Indeed, on looking into the report of the debates of this session, and into the discussions upon the report of the committee on the division of the church, and especially upon the all-absorbing subjects that led to its necessity, no one can fail to be impressed with the eminent ability and intelligence of the leading members of that body; nor for a moment

doubt but that they were profoundly skilled in all the history, practice, and usages of the church government, spiritual and temporal, and in the nature and extent of their own powers, as the highest judicatory belonging to it. As it respects the action of this body in the matter of division, no one can pretend but that it proceeded upon the assumption of unquestioned power to erect the church into two separate ecclesiastical establishments. The only doubt entertained or expressed in the plan of separation, related to the division of the common property, on account of the sixth restrictive article, which we have conceded all along was not within its competence, but which we shall presently notice more particularly in another part of the case. Independently of this question of property, the power of severance is written upon every page of their proceedings. Having now arrived at the conclusion that the general conference of 1844 was competent to make the division, and that the only condition annexed to it has been fully complied with, we are prepared to apply the principles of law, which, in this posture of the case, must govern it.

We have held, in a previous part of this opinion, that the complainants must bring themselves within the description of persons entitled to the benefit of this charitable fund as prescribed by its original founder; and that, when they have done this, those who deny or withhold the charity must present a case to the court, taking them out of the description. This has been attempted by showing that they have wrongfully separated from the connection and communion of the Methodist Episcopal Church, and erected themselves into an independent ecclesiastical establishment, and have therefore deprived themselves of the character of beneficiaries of the fund. Having arrived at the conclusion that there is no foundation for this allegation, the ground of defense, of course, fails; and the complainants still continue clothed with the character and rights belonging to them previous to the separation. The separation having taken place in pursuance of the action of the competent ecclesiastical authority, by the action of the founders of the fund themselves, how can it be maintained that the beneficiaries, falling within the new organization, have forfeited the character which entitles them to its enjoyment? What act have they done to deprive them of the description of the persons for whose relief its proceeds have been permanently devoted? It is not pretended but that they are still traveling preachers in the Methodist Episcopal connection and communion, subject to its doctrines and discipline, and devoted to the accomplishment of that mission for which this church was planted in these United States; nor but that the field of their labors is within the domain covered by its original organization. A new construction of its polity, within this limit, has been deter-

mined upon by its highest judicatory, in order that the great mission may be more harmoniously and more effectually carried on. For this purpose two distinct ecclesiastical organizations, we may say identically the same, have taken the place of one, the same discipline, faith, and doctrine, and all united in spreading the same gospel and teachings throughout the land. Assume, therefore, that the general conference was disabled on account of the sixth restrictive article, from apportioning this fund; still, if the complainants bring themselves within the description of the beneficiaries, they are not thereby deprived of it. The law steps in and enforces the right. Holding this relation to it, and not having forfeited it by any wrong act of their own, or by any cause set up against them, it is not in the competence of the general conference and annual conferences combined to deprive them. Their right rests upon established principles of law and equity, which make it the duty of a court of chancery to interfere, and see that the fund is properly administered.

Looking at the position of these complainants and those they represent, on account of the action of the general conference of 1844, dividing the ecclesiastical organization and substituting in its place two distinct, independent judicatories, it is by no means certain that the distribution is in contravention even of the sixth restrictive article, that appropriates the fund for the benefit of the traveling supernumeraries and worn-out preachers, their widows and orphans. It is this description of persons to whom it is destined by the adjudication of the court. They are not only within the description, but are also the very persons heretofore in the enjoyment of it, and for whom it was originally intended. Granting that these persons have done no wrongful act, but are still laboring in the church as heretofore, except under a different merely territorial organization, they are covered by the spirit if not by the letter of the restrictive article.

Upon the whole, our conclusion is that the complainants are entitled to their share of the produce of the book concern, and a decree will be ordered accordingly. Whether the funds shall be administered by an application of produce pro rata, or by an apportionment of the capital, are questions reserved until the settlement of the decree. We had hoped that this unfortunate controversy would have been amicably adjusted by the parties, agreeably to the suggestion of each of the learned counsel, at the close of the argument, and in which the court cordially concurred. But if the views we have taken of the case, and conclusions we have arrived at, shall tend in the least degree to heal the unhappy divisions, and restore brotherly affection and Christian friendship among so highly useful and distinguished a body of Christians, we shall not regret the labor we have bestowed in deciding it.